IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

THOR IAN GENSINGER,

      Plaintiff,

v.                             CASE NO. 4:16-cv-697-WS-GRJ

JULIE JONES,

      Defendant.

_____/

## **REPORT & RECOMMENDATION**

      This matter is before the Court on ECF No. 21, Defendant's Motion for Summary Judgment. Plaintiff filed a response, ECF No. 28, and the motion is therefore ripe for review. For the reasons discussed below, the Court respectfully recommends that Defendant's motion for summary judgment be granted.

## I.  INTRODUCTION

      Plaintiff, an inmate in the custody of the Florida Department of Corrections ("FDOC"), initiated this case by filing a *pro se* complaint under 42 U.S.C. § 1983 on October 31, 2016. ECF No. 1. After direction from the Court, Plaintiff filed his amended complaint alleging a First Amendment claim against Julie Jones, Secretary of the FDOC, in her official capacity.

("Secretary Jones). ECF No. 7.

Specifically, Plaintiff contends that Secretary Jones violated his First Amendment rights by impounding his books for allegedly violating Rule 33-501.401 of the Florida Administrative Code because the books contained images that could be used for tattoo patterns. Plaintiff takes issue with the rule itself and with the prison staff's application of the rule to his books, arguing that impounding his books based on this rule was done unfairly and in a discriminatory manner. As relief, Plaintiff requests the Court to revise Rule 33-501.401 to allow prisoners to have art or drawing books without discrimination. He also requests the Court to replace, reorder, or reimburse him for the impounded books. *Id.*

## II.  EVIDENCE

In 2016, while Plaintiff was incarcerated at Madison Correctional Institution, a total of five books mailed to him were impounded and rejected by the Literary Review Committee ("LRC") based on Rule 33-501.401(3)(m) of the Florida Administrative Code. These books included *Drawing and Designing Tattoo Art*, *How to Draw Harley-Davidson Motorcycles*, *How to Draw with Drew Brophy*, *The Encyclopedia of Monograms*, and *The Monster Book of Manga: Fairies and Magical*

2

*Creatures*. ECF No. 7; ECF No. 21-4 at 2–3.

Rule 33-501.401(3)—known as the Admissible Reading Material Rule—permits the FDOC to screen all mail entering correctional facilities and to impound and reject certain publications.[1] Under this rule, a publication received through the mail must be rejected if it "presents a threat to the security, order or rehabilitative objectives of the correctional system or the safety of any person." Fla. Admin. Code r. 33-501.401(3)(m). To facilitate this screening of incoming publications, the LRC has implemented extensive guidelines and procedures as discussed below. ECF No. 21 at 4–5; ECF No. 21-3 at 3, 6.

When an inmate receives a publication through the mail—such as the books Plaintiff received in this case—the mail room staff first look on the LRC Decision List to determine whether the book has previously been rejected by the LRC. If the book appears on the list, it is immediately impounded. If the book is not on the list, the mail room staff then review the

---

[1] Rule 33-501.401(3) of the Florida Administrative Code provides in relevant part:

Inmates shall be permitted to receive and possess publications per terms and conditions established in this rule unless the publication is found to be detrimental to the security, order or disciplinary or rehabilitative interests of any institution of the department, or any privately operated institution housing inmates committed to the custody of the department, or when it is determined that the publication might facilitate criminal activity.

publication to determine whether it may violate any of the FDOC's rules.[2]

ECF No. 21 at

4; ECF No. 21-3 at 2–3.

If the mail room staff believes that a publication potentially violates a rule, the staff bring the publication to the attention of the warden or assistant warden. The warden or assistant warden then reviews the book to determine whether the publication violates a rule or regulation. If the publication does, the reviewer completes a "Notice of Rejection or Impoundment of Publications" (DC5-101). The reviewer then sends photocopies of the pages in question and the DC5-101 to the Central Office for review by the LRC. ECF No. 21 at 4–5; ECF No. 21-3 at 3.

The LRC, composed of three members, then reviews the DC5-101 and pages in question to make the final determination as to whether the publication violates a rule. If the LRC confirms the impoundment, the book is placed on the LRC Decisions List as rejected, and the inmate is notified of the LRC's decision. ECF No. 21 at 5; ECF No. 21-3 at 3.[3]

---

[2] According to Charles Huber, a member of the LRC for the FDOC, books that potentially violate the FDOC's rules and regulations "include books containing acts of violence, sex, escape, or tattoo patterns, or images that could be used for tattoo patterns." ECF No. 21-3 at 3.

[3] This procedure for screening incoming publications through the mail is different from the process for stocking prison libraries. When books are donated to the prison,

In this case, Plaintiff's five books were impounded and rejected for violating the LRC's rule that publications must be rejected under Rule 33-501.401(3)(m) if they depict the following: (1) "how to make a tattoo instrument"; (2) "how to make or secure the inks or other supplies needed to make tattoos"; (3) "how to do tattoos"; (4) "tattoo patterns"; or (5) "photographs of tattoos that are large and distinctive enough to be used to create a tattoo." Specifically, Plaintiff's books were impounded because the LRC had previously rejected some and because the LRC determined that the others either contain tattoo patterns or drawings distinct and bold enough to be used as tattoo patterns. ECF No. 7 at 5–6; ECF No. 21 at 3–4; ECF No. 21-3 at 5–10; ECF No. 21-4 at 2–3.

According to the FDOC, books related to tattoos and containing potential tattoo patterns violate the Admissible Reading Material Rule because they pose a threat to the safety of prisoners and guards as well as to the security of correctional institutions. *See* Fla. Admin. Code r. 33-401.401(3)(m). For example, prison tattoos pose a number of health risks to inmates due to the use of unsterile needles, inks, and other objects for tattooing in a prison environment. Tattoos can also represent gang

---

the reviewers check only to see if the books appear on the list of rejected publications. If not, they are placed in the libraries. ECF No. 21 at 5–6; ECF No. 21-3 at 4.

membership, which can lead to violence and other security and safety issues. Further, tattooing and books with tattoo patterns can also be used to facilitate illicit commerce within prisons. ECF No. 21-5; ECF No. 23-2.

Plaintiff asserts that the impoundment of his five books under this rule violated his First Amendment rights. Without disagreeing that his books contained images large enough to be used as tattoo patterns, Plaintiff argues that the rule was applied in an unfair and discriminatory manner to his books because the LRC has approved other drawing and tattoo books with images that could be used for tattoo patterns. Plaintiff also argues that it is unfair for his books to be impounded when the library contains books that have images that could be used for tattoo patterns and when inmates can receive pictures of family members that could also be used as tattoo patterns. ECF No. 7 at 5–6; ECF No. 28 at 10–40.

### III.  STANDARD OF REVIEW

The entry of summary judgment is appropriate only when the Court is satisfied "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the Court must examine the pleadings,

6

depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." *Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). But, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013) (internal quotations and citations omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (to defeat summary judgment "there must be evidence on which the jury could reasonably find for the plaintiff") "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988) ("The summary judgment standard requires that we resolve all reasonable doubts in favor of the non-moving party, but it does not require us to resolve all doubts in such a manner.").

As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the

7

nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried. *See Anderson,* 477 U.S. at 250; *Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 785–86 (11th Cir. 2005). In civil actions filed by inmates, federal courts

> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgement stage.

*Beard v. Banks,* 548 U.S. 521, 530 (2006). Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact. *See, e.g., Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## IV.  DISCUSSION

Secretary Jones argues that she is entitled to summary judgment because Plaintiff has no valid claim under the First Amendment. More specifically, she argues that Rule 33-501.401 is valid as reasonably related to legitimate penological interests under the standard set forth in *Turner v. Safely,* 482 U.S. 78 (1987). Consequently, Secretary Jones says that Plaintiff cannot show a violation of his First Amendment rights based on the FDOC's reliance on this valid prison regulation to impound Plaintiff's books. ECF No. 21.

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safely,* 482 U.S. 78, 84 (1987). Because prisoners have constitutional rights, "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 405–06 (1974). But because of the difficulties in running a prison, prison authorities are due significant deference in creating prison regulations. *Turner*, 482 U.S. at 84–85. Moreover, "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison

9

authorities." *Id.*

"To balance judicial deference with 'the need to protect constitutional rights,' the *Turner* Court held that a prison regulation affecting constitutional rights is valid as long as 'it is reasonably related to legitimate penological interests.'" *Prison Legal News v. Sec'y, Fla. Dep't of Corr.*, 890 F.3d 954, 965 (11th Cir. 2018) (quoting *Turner,* 482 U.S. at 89). Further, there must be "more than a formalistic logical connection between [the regulation] and a penological objective." *Id*. (quoting *Beard v. Banks*, 548 U.S. 521, 535 (2006) (plurality opinion)).

In applying the *Turner* standard to this case to determine whether the regulation violates the First Amendment, the FDOC must show that the impoundment of Plaintiff's books was "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89

To start, the FDOC's interests in impounding Plaintiff's books—the safety of inmates and the public as well as prison security—are legitimate. *See id.* at 967 (citing *Perry v. Sec'y, Fla. Dep't of Corr.*, 664 F.3d 1359, 1366 (11th Cir. 2011) ("[P]rotecting the public and ensuring internal prison security are legitimate penological objectives.")). Plaintiff does not dispute the legitimacy of these interests.

Because the penological interests asserted in support of the regulation are legitimate, the Court must now determine whether the FDOC's impoundment of Plaintiff's books "is reasonably related to [those] legitimate penological interests." *Turner,* 482 U.S. at 89. To determine the reasonableness of a regulation that interferes with a prisoner's constitutional rights, the *Turner* Court established a four-factor test. *Turner,* 482 U.S. at 89.

The four *Turner* factors are: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and the allocation of prison resources generally"; and (4) whether there is "an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests." *Id.* at 89–91.

Plaintiff argues that Rule 33-501.401(3)(m) as applied to his "how to draw" books fails all four *Turner* factors and therefore violates his First Amendment rights. ECF No. 28. The Court discusses each factor in turn

below.

### A.    First *Turner* Factor: The Existence of a Rational Connection

Under the first *Turner* factor, Secretary Jones must show that there is a valid, rational connection between the regulation permitting the impoundment of Plaintiff's books and Defendant's interests in prison security and public safety. *See Turner*, 482 U.S. at 89. Her position is that preventing inmates from possessing books that contain tattoo patterns or images that could be used as tattoo patterns is rationally connected to prison security and the health interests of inmates and the public. ECF No. 21 at 8–11. Plaintiff's position is that his books are "how to draw" books (not tattoo books), which pose no health or safety risks, and that the health and safety risks proffered by Secretary Jones are not caused by tattoos. ECF No. 28 at 2–4.

In determining whether a "rational connection" exists, "the logical connection between the regulation and the asserted goal [must not be] so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. But Defendant is not required to show that such books have caused "actual incidents of violence" or "an actual security breach to satisfy this factor." *Prison Legal News*, 890 F.3d at 968. "Instead, the

12

Supreme Court recognized that prison officials must be able to '*anticipate* security problems and . . . adopt innovative solutions' to those problems to manage a prison effectively." *Id.* (quoting *Turner*, 482 U.S. at 89). Ultimately in making this assessment, one "question is whether the prison officials are rational in their belief that, if unchecked [the banned item] could lead to gang behavior among inmates and undermine prison security in the future." *Singer v. Raemisch*, 593 F.3d 529, 536 (7th Cir. 2010).

Secretary Jones argues there are multiple legitimate health and security interests in preventing inmates from possessing books that contain tattoo patterns or images that could be used as tattoo patterns. With regard to health interests, tattooing in a prison environment can cause a variety of medical problems from the use of unsterile devices and inks, including Hepatitis B and C, HIV, toxic shock syndrome, and numerous infections. ECF No. 21 at 10–11; ECF No. 21-5 at 3, 4. The FDOC has an obvious interest in preventing the spread of such diseases.

With regard to security interests, there is both a risk of illicit commerce and gang violence associated with tattoo books and tattooing in prison. For instance, if a prisoner used an image from one of these

books as a tattoo pattern and then gave another inmate a tattoo, that prisoner may want to be compensated (or the books themselves could be used in commerce in exchange for tattoos). Such illicit commerce can result in a variety of security issues and the use of additional resources to prevent it. Additionally, tattoos can be used to reveal gang association, so an increase in tattooing in prison could lead to an increase in gang activity and violence. ECF No. 21 at 10–11; ECF No. 23-2 at 3. The FDOC has an interest in preventing illicit trading and gang violence.

Plaintiff takes issue with Secretary Jones' position as it pertains to his impounded books. Specifically, he argues that his books were "how to draw" books not tattoo books and that there are no health risks associated with drawing (although he does not dispute the health risks associated with tattooing).  He also argues that everything in prison poses a risk of illicit commerce. Further, he asserts that gang violence in the FDOC stems not from tattoos but from drug use, drug dealing, and other issues, and that his books did not contain images that could be used for symbols in gang tattoos. ECF No. 28 at 2–4.

Plaintiff's argument, however, misses the mark. Secretary Jones need not show that tattoos or drawing books such as Plaintiff's with

14

images large enough for use as tattoo patterns have actually led to violence or led to the spread of diseases in the past. Defendant must show only that a rational connection exists between the Rule 33-501.401(3)(m) and the FDOC's legitimate interests in security and safety.

Here, there is a valid, rational connection between the regulation permitting the impounding of books that contain images large enough for use as tattoo patterns and interests in safety and prison security. The images within the books could be used for tattoo patterns, resulting in tattooing with unsterilized needles and other materials hazardous to inmate health. Such books could also be used to create gang tattoos, which could result in increased gang activity and gang violence in prisons. Moreover, there is also a possibility these drawing books could be used to perpetuate illicit commerce, whether through exchanging other items for tattoos or through trading the books themselves. All of these possibilities represent health and safety risks within the FDOC.

Therefore, the connection between the regulation for impounding these books and the goal of ensuring safety and security in prisons is not "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89–90. Instead, the Court finds that there is a rational connection

between impounding Plaintiff's books and prison security and safety. This factors favors Secretary Jones.

## B.   Second *Turner* Factor: Alternative Means

The second factor involves whether there are alternatives means available to Plaintiff to assert his First Amendment right. *Turner*, 482 U.S. at 90. Secretary Jones argues Plaintiff has alternatives to express his First Amendment right because he can access the many drawing books already in the prison library. ECF No. 21 at 11–12. Plaintiff's position is that because there are other drawing books and books with images large enough to be tattoo patterns inside the prison already, the impounding of his books under the regulation is unfair and discriminatory. ECF No. 28 at 4–5.

"Where 'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 U.S. at 90 (citations omitted). "[P]risons do not have to provide exact, one-for-one substitutes to provide alternative means." *Prison Legal News*, 890 F.3d at 972. Further, to satisfy this factor substitutes "need not be ideal, however; they need only be available."

16

*Overton v. Bazzetta*, 539 U.S. 126, 135 (2003).

Plaintiff concedes that he has access to numerous drawing books and books with similar content in the library and chapel. But he argues that because there are other drawing and tattoo publications available, the tattoo rule has been applied unfairly and arbitrarily to his books and has resulted in discrimination against certain books based on the mail room staff's opinion of each book. ECF No. 28 at 4–5.

Plaintiff's contention regarding the unfair and arbitrary application of the regulation to his books is refuted by the FDOC's procedures for reviewing incoming mail and for stocking prison libraries. With regard to incoming mail, the mail room clerk, the warden or assistant warden, and the LRC must all decide that the publication violates the regulation before the book is rejected. This three-step process ensures that books are not impounded based solely on the opinion of the mail room staff, as Plaintiff suggests. Further, the process for screening books donated for use in the prison libraries is far less extensive than the process for screening incoming publications sent through the prison mail, so books may exist in the library that otherwise would not be permitted to inmates directly

17

through the mail.[4] ECF No. 21 at 11–12; ECF No. 21-3 at 2, 3; ECF No. 28 at 5.

In attempting to argue the unfair or arbitrary application of this regulation, Plaintiff has only highlighted the existence of a myriad of available alternative means to exercise his First Amendment right: drawing books, picture books, and books with large images that he can access in the prison library or chapel. Accordingly, this second factor favors Defendant.

## C.   Third *Turner* Factor: Impact of Accommodating the Asserted Right

The third factor involves "the impact accommodation of [Plaintiff's First Amendment] right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Secretary Jones contends that allowing Plaintiff to have books that contain images large enough for use as tattoo patterns would impact guards' duties, other inmates' health and safety, and the allocation of prison resources. ECF No.

---

[4] Books donated to the library are permitted so long as they are not already on the LRC's list of rejected books; there is no additional screening involved. Books sent through the prison mail are first screened based on whether they are on the list of rejected books. But if they are not on the list, the mail room staff then examines the book for potential regulation violations. Therefore, books that might ultimately be rejected if sent to an inmate through the prison mailing system may be placed in the library if not already on the list. ECF No. 21 at 4–5, 11.

21 at 12–13. Plaintiff argues that drawing books have never caused increased cell searches, danger to staff or inmates, or the use of additional resources for investigations. ECF No. 28 at 5–6.

"In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Turner*, 482 U.S. at 90. Further, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be *particularly deferential* to the informed discretion of corrections officials." *Id.* (emphasis added).

Secretary Jones asserts that allowing Plaintiff to keep his books will force prison staff to allocate time and resources to detecting and preventing the security and safety risks discussed above, such as illicit commerce, gang violence, and the spread of diseases. For example, prison guards would have to devote additional resources to security measures in the event of violence and to search cells for commerce items. There would also be an increased need for resources to address disciplining inmates for such violence or illicit bartering. Additionally, the prison system generally would have to allocate more resources to treating

and preventing the types of diseases that could result from tattooing in prison. ECF No. 21 at 12–13; ECF No. 23-2 at 3–2.

Allowing these drawing books for Plaintiff's use would also make the images available to other inmates for use in creating tattoos, as he or others could create tattoo patterns using the books and pass around those patterns to those who do not have his specific drawing books. This "ripple effect" would compound the burden placed on FDOC staff and the risks posed to other inmates. As a result, further deference is owed to the correctional officials who created the regulation rejecting such books. Therefore, this third factor favors Defendant.

**D.    Fourth *Turner* Factor: Exaggerated Response**

The final *Turner* factor involves whether the regulation is reasonable or "an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. Secretary Jones' position is that impoundment of books that violate the rules is not an exaggerated response to the security and safety risks at issue. ECF No. 21 at 13–14. Plaintiff's position is that the impoundment is an exaggerated response because his books are drawing books, not tattooing books, and other drawing books are available. ECF No. 28 at 6–7.

One way to determine whether a regulation is an "exaggerated response" to prison concerns is to consider whether there are "obvious, easy alternatives" to the regulation. *Turner,* 482 U.S. at 90. While prison officials do not have to consider every possible alternative, if an inmate "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91. Moreover, the Supreme Court has upheld regulations requiring individualized determinations for rule violations, such as where a warden must make "the determination that a [publication] is 'detrimental to the security, good order, or discipline of the institution.'" *Thornburgh v. Abbott,* 490 U.S. 401, 416 (1989).[5]

Here, the FDOC's decision to impound books with tattoo patterns and with images large enough to be used as tattoo patterns is not an exaggerated response to the multitude of health, safety, and security concerns discussed above. Plaintiff offers no reasonable alternative to the impoundment of such books; instead, he suggests that all drawing books

---

[5] In support of upholding the regulation at issue in this case, the mail room staff, the warden or assistant warden, *and* the LRC must *all* determine that a publication violates the rules.

should be permitted since some already exist inside the prison libraries. But allowing more such books would only exacerbate the health and security risks at issue and result in an allocation of more resources to prevent and address these concerns. Accordingly, this final factor favors Defendant.

## V.  CONCLUSION

In light of the four *Turner* factors, the Court finds that a reasonable relationship exists between the impoundment of Plaintiff's books under Rule 33-501.401(3)(m) and the FDOC's legitimate interests in prison security and the health and safety of inmates and the public. Because all four *Turner* factors favor Secretary Jones, the impoundment of the books under Rule 33-501.401(3)(m) does not violate Plaintiff's First Amendment rights.

It is respectfully **RECOMMENDED** that:

Defendant's Motion for Summary Judgment, ECF No. 21, should be **GRANTED**.

**IN CHAMBERS** at Gainesville, Florida, this 27th day of June 2018.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**